IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION

No. 2:25-cv-00041-M-RN

**FILED**

**DEC 0 1 2025**

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____
_____ DEP CLK

DERENCE V. FIVEHOUSE,
Plaintiff,

v.

U.S. DEPARTMENT OF DEFENSE;
DEFENSE HEALTH AGENCY;
HON. PETE HEGSETH, in his official capacity as
Secretary of Defense; and
DR. DAVID J. SMITH, in his official capacity as
Acting Director, Defense Health Agency,
Defendants.

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

**INTRODUCTION** ..... 3

**STATEMENT OF UNDISPUTED MATERIAL FACTS** ..... 5
**STANDARD OF REVIEW**

I. De Novo Review of Statutory Interpretation ..... 7

II. Arbitrary and Capricious Review of Substantive Decisions ..... 7

III. Review of Acts in Excess of Statutory Authority ..... 8

IV. Review of Procedural Violations ..... 8

V. Harmless Error and Remedy ..... 8

VI. Injunctive Relief ..... 9

**ARGUMENT** ..... 10

I. TRICARE PROGRAM BENEFITS ARE THE SAME ..... 10
FOR ALL COVERED BENEFICIARIES

II. DHA'S CIRCULAR TRAP FROM POST HOC ..... 11
INTERPRETATION AND IMPLEMENTATION OF

NDAA 2017 § 729

III. THE 'USED EXCLUSIVELY' REQUIREMENT
DEFEATS DHA'S POSITION: MULTI-USE DRUGS
CANNOT BE SELECTIVELY DENIED TO TFL
BENEFICIARIES                                                        13

IV. 10 U.S.C. § 1079(A)(10) / 32 C.F.R. § 199.4(G)(28)              16
INAPPLICABLE TO GLP-1 DRUGS COVERED
THROUGH PRIOR AUTHORIZATION – EVEN USING
EXISTING LANGUAGE

V. DHA'S MEDICARE EXCUSE FAILS: TRICARE'S                            19
INDEPENDENT PHARMACY PROGRAM IS NOT
 BOUND BY MEDICARE'S EXCLUSIONS

VI. DHA'S CLAIM OF MINISTERIAL DUTY IS                               20
PRETEXTUAL: EIGHT YEARS OF CONTRARY
PRACTICE EXPOSES NONDISCRETIONARY
DISCRIMINATION.

VII. DHA'S PROCEDURAL VIOLATIONS CONFIRM                             22
BAD FAITH: BYPASSING MANDATORY REVIEW
TO HIDE DEFECTIVE REASONING.

VIII. PLAINTIFF MEETS ALL ELEMENTS FOR                              25
SUMMARY JUDGMENT AND PERMANENT
INJUNCTION

**RELIEF REQUESTED**                                                32

I. Vacatur (APA)                                                    32

II. Permanent Injunction (Parity/Uniformity)                       32

III. Process-conditioned Prospective Relief                        32

IV. Reinstatement/Reprocessing                                     32

V. Declaratory Judgment                                            32

VI. Implementation/Notice                                          33

VII. Fees and Costs                                                33

VIII. Retention of Jurisdiction                                    33

**CONCLUSION**                                                     33

# INTRODUCTION

As a threshold matter, Plaintiff submits that this case is appropriate for early determination on a minimal administrative record. The detailed argument for minimal administrative record review is set forth in Plaintiff's Motion for Judicial Notice filed concurrently herewith, and is incorporated herein by reference.

This case presents a fundamental question: Can the Department of Defense, Defense Health Agency (DHA) exclude the Plaintiff and 2.5 million TRICARE For Life (TFL) beneficiaries from accessing medications on the uniform formulary based solely on their plan status? The answer is no.

The fundamental structure of TRICARE prohibits the differentiation DHA has created. Section 1086 of 10 U.S. Code (Contracts for health benefits for certain members, former members, and their dependents), brings retirees over the age of 65 and disabled retirees enrolled in Medicare fully into the family of TRICARE covered beneficiaries. Section 1086(a) mandates that the Secretary "shall contract under the authority of this section for health benefits for those persons under the same insurance, medical service, or health plans he contracts for under section 1079(a) of this title," explicitly requiring that retirees receive "the same" coverage -- not similar, comparable, or modified benefits, but "the same." If Congress intended to permit differentiation between beneficiaries, it would have included language such as "except as otherwise provided" or "unless the Secretary determines." The absence of such language, combined with the mandate in 10 U.S.C. § 1074g(a)(2)(E) for a "uniform formulary of pharmaceutical agents" available to all "eligible covered beneficiaries," compels the conclusion that coverage must be uniform, regardless of plan, across all TRICARE programs.

Congress created the TRICARE Senior Pharmacy Program (TSPP) (10 U.S.C. 1074g) to restore and protect, not undermine, pharmacy benefits for disabled and senior enrolled in Medicare. The protections included equal pharmacy access to the full uniform formulary. Congress hardened the Pharmacy Benefits Program as "independent" and mandated processes to ensure fairness in administration. DHA is required to assure the availability of pharmaceutical agents in the complete range

of therapeutic classes, and to select particular agents based only on their relative clinical and cost effectiveness. 10 U.S.C. § 1074g(a)(2)(A)-(B). See also 69 Fed. Reg. 17,842, 17,843–44 (Apr. 7, 2004) (explaining that agents on the uniform formulary 'shall be available to eligible covered beneficiaries.') The uniform formulary operates at the drug level, not the beneficiary level. DHA may impose indication-based limitations through prior authorization (PA), but cannot exclude entire categories of beneficiaries from formulary access. Nothing in § 1074g or 32 C.F.R. § 199.21 (TRICARE Pharmacy Benefits Program) permits a decision to exclude a class of beneficiaries from coverage for pharmaceuticals on the uniform formulary or for substituting Medicare's exclusions for TRICARE's own clinical- and drug cost-effectiveness criteria.

When Congress authorized expanded treatment for obesity and other chronic conditions through NDAA 2017 § 729 it did so for all "covered beneficiaries" in the "TRICARE Program" -- by statutory definition: Prime, Select, and TFL. By its interpretation of events, DHA violated this parity requirement by implementing § 729's supersession of the obesity exclusion for Prime/Select beneficiaries through 32 C.F.R. § 199.17 (TRICARE Program) subsection (f)(3). DHA asserts it consciously excluded TFL from the access to expanded treatments (formerly excluded by 10 U.S.C. 1079(a)(10)), maintaining the prohibition in 32 C.F.R. § 199.4(g)(28) only for TFL. Accepting this argument means that DHA deliberately created the type of plan-based discrimination that Congress prohibited.

The government's position rests entirely on a circular trap of its own creation. After concluding in 2017 that NDAA 2017 § 729 superseded the obesity prohibition in 10 U.S.C. § 1079(a)(10)/§ 199.4(g)(28), DHA argues in 2025 that its own unauthorized choice to limit its application to Prime/Select leaves the prohibition applicable to TFL only. In its articulation of the newly promulgated 32 C.F.R. 199.17(f)(3), DHA wrote:

> (". . . it is DoD's conclusion that the underlying authority of 10 U.S.C. 1097, together with section 729 of NDAA-17 (which specifically authorizes medical intervention for obesity), allow the Department to cover these services when provided by a network provider **for a TRICARE Prime or TRICARE Select enrollee**.")
>
> 82 Fed. Reg. 45,443 (Sept. 29, 2017). (Emphasis added.)

This bootstrapping of language in § 199.17(f)(3) from 2017, which has limited application, to revive prohibitions in § 199.4(g)(28), which like 10 U.S.C. § 1079(a)(10), was superseded by NDAA § 729, violates fundamental principles of administrative law: an agency cannot use its own discriminatory implementation of governing law to justify further discrimination.

DHA's argument focuses on incredibly strained interpretations of regulations and ignores the overall program of equality of care that Congress tasked DHA to oversee. It violates the statutory mandate, exceeds regulatory authority, and discriminates against senior and disabled veterans who earned equal access through their service. DHA cannot achieve through administrative maneuvers what Congress deliberately chose not to authorize: a two-tier medical and benefits health program based on age or plan.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The undisputed facts necessary to resolve this case are established through: (1) Plaintiff's Motion for Judicial Notice filed concurrently herewith; and (2) the undisputed factual predicates established through the government's own admissions. Resolution requires no extensive administrative record.

1. TRICARE For Life (TFL) is part of the "TRICARE program" as defined by 10 U.S.C. § 1072 and is the Medicare wraparound option administered under 10 U.S.C. § 1086(d) and implemented at 32 C.F.R. § 199.17(b)(1)(ii)(C).

2. Congress mandated a single, uniform formulary available to all eligible covered beneficiaries. Under 10 U.S.C. § 1074g(a)(1)-(2), pharmaceuticals on the "uniform formulary" "shall be available to eligible covered beneficiaries," and nothing in § 1074g authorizes plan-by-plan formularies or plan-based access discrimination.

3. Section 1086(a) requires parity ("the same") in health plans for Medicare-eligible retirees. The statute uses mandatory language -- "shall contract" for "the same" plans.

4. From 2017 through 2024, DoD's P&T Committee and the UF-BAP repeatedly reviewed GLP-1/weight-management agents under uniform criteria without proposing any TFL-specific exclusion or plan-type carve-out.

5. Wegovy (semaglutide 2.4 mg) was placed on the uniform formulary in August 2021 with prior authorization (PA) criteria, and Zepbound (tirzepatide) was added in November 2023; neither entry adopted a TFL-only exclusion.

6. On March 10, 2025, DoD paused advisory committees including the P&T Committee and UF-BAP, and were suspended as of August 31, 2025.

7. On or about July 31, 2025, DHA announced "clarifying revisions" to prior-authorization forms effective August 31, 2025.

8. Effective August 31, 2025, those "clarifying revisions" excluded TFL beneficiaries from GLP-1 coverage for weight-management indications while maintaining GLP-1 coverage for Prime/Select beneficiaries for identical health indications.

9. DHA implemented the August 31, 2025 change without P&T Committee review or recommendation, without UF-BAP public comment, and without a written Director decision contemporaneously authorizing a beneficiary-class exclusion.

10. DHA did not publish any notice in the Federal Register and did not conduct APA notice-and-comment rulemaking for the August 31, 2025 change.

11. Before August 31, 2025, TFL beneficiaries who met the prior authorization criteria, including the Plaintiff, received GLP-1 coverage for weight-management indications; after that date TFL beneficiaries were excluded while Prime/Select beneficiaries continued to receive coverage.

12. DHA has identified 32 C.F.R. § 199.4(g)(28) as its legal rationale for the August 31, 2025 exclusion of TFL beneficiaries from GLP-1 coverage for weight management.

## STANDARD OF REVIEW

The Administrative Procedure Act requires this Court to "hold unlawful and set aside agency action" that fails to meet statutory standards. 5 U.S.C. § 706. The Court reviews DHA's exclusion of TFL beneficiaries from formulary coverage under multiple independent standards, each of which provides grounds for reversal. Where, as here, clear statutory violations exist alongside substantive procedural defects, the Court may resolve the case on substantive grounds to provide complete relief. PDK Labs.,

Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004); Nat'l Parks Conservation Ass'n v. Semonite, 916 F.3d 1075, 1082 (D.C. Cir. 2019).

I. <u>De Novo Review of Statutory Interpretation</u>: Following Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244 (2024), courts exercise independent judgment when interpreting statutory provisions. Id. at 2266. The Court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." Id. Courts no longer defer to agency interpretations of ambiguous statutes but instead determine statutory meaning using traditional tools of construction. While courts may consider an agency's interpretation for its persuasive value, "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." Id. at 2262. This de novo review applies to all questions of statutory authority and the scope of congressional delegations to agencies.

II. <u>Arbitrary and Capricious Review of Substantive Decisions</u>: Agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under Motor Vehicle Manufacturers Ass'n v. State Farm, 463 U.S. 29, 43 (1983). An agency rule is arbitrary and capricious if the agency:

> i. relied on factors which Congress has not intended it to consider;

> ii. entirely failed to consider an important aspect of the problem;

> iii. offered an explanation for its decision that runs counter to the evidence before the agency; or

> iv. is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

This standard requires the reviewing court to "conduct a searching and careful inquiry into the facts" while recognizing that review remains "narrow" and courts may not "substitute [their] judgment for that of the agency." Dep't of Com. v. New York, 139 S. Ct. 2551, 2569 (2019). However, courts "cannot ignore evidence undermining the [agency's] decision" and must ensure the agency "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43 (internal quotations omitted).

III. Review of Acts in Excess of Statutory Authority: Agency action must be set aside when taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). This inquiry overlaps with but remains distinct from statutory interpretation under § 706(2)(A). Where an agency asserts authority Congress never granted or acts beyond the scope of delegated power, the action is ultra vires. Courts presume Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). Agency claims of authority to make decisions of "vast economic and political significance" require clear congressional authorization. West Virginia v. EPA, 597 U.S. 697, 723 (2022).

IV. Review of Procedural Violations: Agency action taken "without observance of procedure required by law" must be set aside. 5 U.S.C. § 706(2)(D). This includes violations of:

      i. Statutory procedural requirements imposed by Congress in the agency's organic statute;

      ii. Notice and comment requirements under 5 U.S.C. § 553 for legislative rules;

      iii. Federal Advisory Committee Act requirements for committee transparency and participation; and

      iv. Due process requirements when agency action affects protected interests.

Procedural violations not only provide independent grounds for reversal but also serve as evidence of arbitrary decision-making under § 706(2)(A). Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 222 (2016) ("Agencies are free to change their existing policies ... but the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy."). An agency's failure to follow required procedures may demonstrate that its substantive decision lacks reasoned support. United States v. Nova Scotia Food Prods. Corp., 568 F.2d 240, 252 (2d Cir. 1977) (procedural defects "clearly had a bearing on the ultimate decision").

V. Harmless Error and Remedy: While courts take "due account" of harmless error under 5 U.S.C. § 706, procedural violations are harmless only where the agency demonstrates "the substance of the decision would have been the same." PDK Labs., 362 F.3d at 799. Where multiple violations exist -- both procedural and substantive -- courts have authority to grant complete relief rather than remanding for

further proceedings that would be futile. NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969) (remand inappropriate where "remand would be an idle and useless formality" because agency "has no discretion to exercise"). The APA's instruction to "set aside" unlawful agency action contemplates vacatur, not merely remand, when legal violations are clear. 5 U.S.C. § 706.

VI. Injunctive Relief: A plaintiff seeking permanent injunctive relief must satisfy the traditional four-factor test: (1) that the plaintiff has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

In APA cases, these factors apply with recognition that vacatur is the presumptive remedy for unlawful agency action. Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("when a court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated"). Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66 (2010), holds that permanent injunctive relief remains appropriate where: (1) the agency action violates substantive statutory commands; (2) the agency lacks authority to reach a different result on remand; or (3) the plaintiff establishes continuing irreparable harm during remand proceedings.

Courts distinguish between procedural violations that may be remedied through proper process and substantive violations where the agency lacks statutory authority to take the challenged action. Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 985 F.3d 1032, 1050 (D.C. Cir. 2021). When an agency acts ultra vires or in excess of statutory authority, the traditional presumption against enjoining government action falls. Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 326-27 (2015). Where "vacating an agency's action could [not] conceivably lead to a different result on remand," permanent relief is appropriate without remanding to the agency. Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

# ARGUMENT

## I. TRICARE PROGRAM BENEFITS ARE THE SAME FOR ALL COVERED BENEFICIARIES

The TRICARE Senior Pharmacy Program and TFL was established by Section 712 of the Floyd

D. Spence National Defense Authorization Act (NDAA) for Fiscal Year 2001, which extended TRICARE

eligibility to Medicare-eligible beneficiaries who enroll in Medicare Part B. (Federal Register, 66 FR

40601)[1] The statutory framework defines TFL at 10 U.S.C. § 1072(13)[2] as "the Medicare wraparound

coverage option of the TRICARE program made available to the beneficiary by reason of section

1086(d)"[3], with the underlying Civilian Health and Medical Program authorized under 10 U.S.C. §§

1079[4] and 1086)(10 U.S.C. § 1072(4).[5] The implementing medical benefits regulations at 32 CFR §

199.17(b)(1)(ii)(C)[6] reiterate that TFL is the Medicare wraparound coverage plan under 10 U.S.C.

1086(d), with rules "generally set forth in §§ 199.3 (Eligibility), 199.4 (Basic Program Benefits), and

199.8 (Double Coverage)." As Rep. Floyd D. Spence declared "This is a huge win for military retirees,"

reflecting widespread sentiment that the legislation finally delivered on long-sought lifetime healthcare

benefits ("TRICARE for Life," Air & Space Forces Magazine, December 1, 2000).[7]

Under 10 U.S.C. § 1074g, the Secretary of Defense must establish "an effective, efficient,

integrated pharmacy benefits program" with "a uniform formulary of pharmaceutical agents." §

1074g(a)(1)-(2). This uniformity requirement is not aspirational -- it is mandatory. The statute specifies

that pharmaceuticals on the uniform formulary "shall be available to eligible covered beneficiaries." §

1074g(a)(2)(E), (i)(1). Nowhere does § 1074g authorize different formularies for different TRICARE

---

[1] https://www.federalregister.gov/documents/2001/08/03/01-19184/tricare-civilian-health-and-medical-program-of-the-uniformed-services-champus-eligibility-and .
[2] https://www.law.cornell.edu/uscode/text/10/1072
[3] https://www.law.cornell.edu/definitions/uscode.php?width=840&height=800&iframe=true&def_id=10-USC-1101086569-422856631&term_occur=5
[4] https://www.law.cornell.edu/uscode/text/10/1079
[5] https://uscode.house.gov/view.xhtml?req=(title:10+section:1072+edition:prelim)+OR+(granuleid:USC-prelim-title10-section1072)&f=treesort&num=0&edition=prelim
[6] https://www.ecfr.gov/current/title-32/section-199.17
[7] https://www.airandspaceforces.com/article/1200tricare/

plans. Nowhere does it permit excluding TFL beneficiaries from accessing formulary medications available to Prime and Select beneficiaries.

The DHA's interpretation destroys uniformity. Under their interpretation, whether a disabled or a 65-year-old retiree receives GLP-1 medications depends not on medical need or clinical criteria, but solely on whether they are enrolled in TRICARE Prime/Select (covered) or TFL (denied). The Pharmacy and Therapeutics (P&T) Committee evaluates drugs based on "relative clinical and cost effectiveness" within therapeutic classes. § 1074g(a)(2)(A), (C). Nothing authorizes evaluating drugs differently based on the beneficiary's enrollment status. If Congress intended to exclude 2.5 million TFL beneficiaries from the uniform formulary, it would have said so explicitly. It did not.

The NDAA 2017 restructured TRICARE programs primarily to improve the health maintenance organization (HMO)-like health plan, known as TRICARE Prime, and to create a preferred provider organization (PPO) health plan, now known as TRICARE Select. It included § 729, which was specifically acknowledged: "The goal of better health is advanced by expanding TRICARE coverage of preventive care services, treatment of obesity, high-value care, and telehealth." (Interim Final Rule, I.A.).[8]

## II. DHA'S CIRCULAR TRAP FROM POST HOC INTERPRETATION AND IMPLEMENTATION OF NDAA 2017 § 729

It should first be noted that the government's explanation has evolved. In its initial pronouncement ending coverage for TFL, it cited 32 C.F.R. § 199.17 as its authority. In its current repose, it relies primarily on 32 C.F.R. § 199.4(g)(28). The change reflects awareness that § 199.17 addresses the medical benefit structure for the managed care plans of Prime and Select and the government cannot use these medical benefit regulations to circumvent the pharmacy program's uniformity requirement. More fundamentally, the savings clause in § 199.17(a)(6)(ii)(C) precludes use of anything in § 199.17 to alter any rules pertaining to TFL. So, the government needed another hook. DHA found § 199.4(g)(28) and resurrects 10 U.S.C. § 1079(a)(10) and § 199.4(g)(28) and applies them only to TFL.

---

[8] https://www.federalregister.gov/documents/2017/09/29/2017-20392/establishment-of-tricare-select-and-other-tricare-reforms

The circular trap: In constructing its latest argument, the government relies on the changes it wrought by authority of NDAA 2017 § 729. Because DHA attributes so much to § 729, as operationalized through 32 C.F.R. § 199.17(f)(3), it is important to understand what it says:

> SEC. 729. IMPROVEMENT OF HEALTH OUTCOMES AND CONTROL OF COSTS OF HEALTH CARE UNDER **TRICARE PROGRAM** THROUGH PROGRAMS TO INVOLVE **COVERED BENEFICIARIES**.
> (a) Medical Intervention Incentive Program. --
>     (1) In general. -- The Secretary of Defense **shall** establish a program to incentivize **covered beneficiaries** to participate in medical intervention programs established by the Secretary, such as comprehensive disease management programs, that may include lowering fees for enrollment in the **TRICARE program . . . for covered beneficiaries** with **chronic diseases or conditions** described in paragraph (2) ...
>
>     **(2) Chronic diseases or conditions described -- Chronic diseases or conditions described in this paragraph may include ..., obesity, and such other diseases or conditions as the Secretary determines appropriate**.
>
> (b) Lifestyle Intervention Incentive Program. -- The Secretary **shall** establish a program to incentivize lifestyle interventions **for covered beneficiaries**, such as smoking cessation and **weight reduction**, that may include lowering fees for enrollment in the **TRICARE program . . . for covered beneficiaries** ....
>
> (c) Healthy Lifestyle Maintenance Incentive Program. -- The Secretary **shall** establish a program to incentivize the maintenance of a healthy lifestyle among **covered beneficiaries**, such as exercise and **weight maintenance**, that may include lowering fees for enrollment in the **TRICARE program** .... **for covered beneficiaries** ....
>            \* \* \* \*
> (f) Definitions. -- In this section, the terms ``**covered beneficiary**'' and ``**TRICARE program**'' have the meaning given those terms in section 1072 of title 10, United States Code. (Emphasis Added.)

And, because the definitions are relevant:

> (7)The term **"TRICARE program"** means . . . :
>
> (A) TRICARE Prime.
> (B) TRICARE Select.
> (C) **TRICARE for Life**.

10 U.S.C. § 1072(7). (Emphasis added.)

From § 729, which DHA characterized as "expanding TRICARE coverage of preventive care services, treatment of obesity, high-value care, and telehealth," it promulgated the following:

> Under the authority of 10 U.S.C. 1097 and sections 706 and 729 of the National Defense Authorization Act for Fiscal Year 2017, notwithstanding 10 U.S.C. 1079(a)(10), treatment of obesity is covered under TRICARE Prime and TRICARE Select even if it is the sole

or major condition treated. Such services must be provided by a TRICARE network provider and be medically necessary and appropriate in the context of the particular patient's treatment.

32 C.F.R. § 199.17(f)(3)

DHA's choice to focus on § 199.17 to implement § 729 is understandable. The programs to treat "obesity" authorized by § 729 were readily implemented through DHA's Managed Care Support Contracts (MCSC) – "network providers" providing "managed care" for Prime/Select beneficiaries under § 199.17. The MCSCs were already delivering programs to Prime/Select beneficiaries. TFL, by contrast, is the Medicare-wrap fee-for-service system administered outside the MCSC framework. TFL coverage is managed by the TRICARE Medicare Eligible Program (TMEP) contractor, which primarily adjudicates claims submitted after Medicare has processed them. TMEP provides no managed care services. TFL has no stand-alone rules. In practice TFL beneficiaries manage their own care. They deal primarily with Medicare providers, not "network providers." part of TRICARE's Managed Care Support Contracts. TFL beneficiaries rarely interact with TRICARE for medical benefits. They see their physicians and receive prescriptions if needed. If prior authorizations are satisfied, TRICARE covers medications as first payer. It was simple, seamless and fair.

DHA's choice to use 32 C.F.R. §199.17(f)(3) to implement § 729 for Prime/Select was one of administrative convenience, not statutory compulsion. Even a cursory read of the plain language of § 729 establishes that Congress mandated the Secretary create these newly authorized programs for all "covered beneficiaries" in the "TRICARE Program." Nowhere in § 729 does Congress say "Prime/Select" only.

Did DHA then truly intend, as it now represents, that its interpretation of § 729 would apply only to Prime/Select? That seems unlikely – as DHA never attempted to force that conclusion on TFL after it promulgated § 199.17(f)(3). It is far more likely that DHA never believed TFL was excluded or that it needed to conform 32 C.F.R. § 199.4(g)(28) to its interpretation of § 729. And, it is likely that DHA did not consider it an issue since TFL received medical services predominately through Medicare, not through DHA's "network providers."

The more important question – one of pure law, is whether DHA had the authority in 2017 to do what it now says it did to TFL i.e., keep § 199.4(g)(28) applicable to TFL only? Before addressing that question, first note the discussion above regarding the overarching requirement for parity in medical/pharmacy benefits for all TRICARE covered beneficiaries. Second, note that § 729 explicitly applied to all covered beneficiaries in the TRICARE Program. From those two indisputable facts, the only conclusion possible is that DHA had <u>no</u> authority except to give full effect to Congress' mandate and enable all TRICARE covered beneficiaries access to the newly authorized treatment options for obesity. DHA asks this Court to accept a truly astounding proposition: that when Congress enacted NDAA § 729 authorizing "treatment of obesity" for all "covered beneficiaries" in the "TRICARE Program," it authorized DHA to implement this authorization discriminately.

But, what if DHA actually decided to exclude TFL from the expanded programs in 2017, or to implement the exclusion shortly before August 31, 2025? Either decision satisfies the definition of arbitrary and capricious in three distinct ways:

First, Disparate Treatment Without Rational Explanation: DHA treated similarly situated beneficiary groups differently under the same statutory mandate without providing a rational basis for the distinction – a classic hallmark of arbitrary action under State Farm.

Second, Failure to Consider Statutory Mandate: DHA's exclusion of TFL ignores Congress's explicit mandate for uniform medical coverage across "all covered beneficiaries in the TRICARE Program," representing a failure to consider an important aspect of Congressional authorization.

Third, acting Ultra Vires: By selectively applying statutory provisions to exclude TFL beneficiaries when Congress mandated inclusion of all beneficiaries, DHA exceeded its delegated authority, making the action not merely arbitrary but void as beyond statutory authorization.

## III. THE 'USED EXCLUSIVELY' REQUIREMENT DEFEATS DHA'S POSITION: MULTI-USE DRUGS CANNOT BE SELECTIVELY DENIED TO TFL BENEFICIARIES

By way of further bootstrapping 32 C.F.R. § 199.4(g)(28) into the pharmacy regulation, DHA asserts that since § 199.4(g)(28) - which only ever prohibited "[s]ervice and supplies related "solely" to

obesity or weight reduction or weight control" – is still viable, it is prohibited from covering GLP-1 drugs for TFL. If true, this would require a change the uniform formulary – which the Declaration of Mr. Norton verifies.

The Pharmacy Benefits Program regulation (§ 199.21) specifically states that the pharmacy benefit is "independent of" other TRICARE provisions that govern medical benefits. Independence is the premise of everything that follows: the uniform formulary, the uniform utilization-management controls (including prior authorization and step therapy) operate without reference to the medical-benefit exclusions collected in § 199.4. To make that independence perfectly clear, the Pharmacy Benefits Program has its own pharmacy-specific limiting principle:

> **Pharmaceutical agents which are used exclusively in medical treatments or procedures that are expressly excluded from the TRICARE benefit by statute or regulation** will not be considered for inclusion on the uniform formulary. Excluded pharmaceutical agents shall not be available as non-formulary agents, nor will they be cost-shared under the TRICARE pharmacy benefits program.

32 C.F.R. § 199.21(a)(3)(iii). (Emphasis added.)

The plain language of § 199.21(a)(3)(iii) establishes a narrow, two-pronged test for excluding pharmaceutical agents from the uniform formulary: a drug can only be barred if it is used (1) "exclusively" for treatments that are (2) "expressly excluded" from TRICARE coverage by statute or regulation. The critical word "exclusively" means the drug must have no legitimate covered uses -- not merely that one possible use is prohibited. The regulation's mandatory language ("will not be considered for inclusion") applies only when both conditions are satisfied: the treatment must be expressly prohibited AND the drug must be used exclusively for that prohibited treatment. Under § 199.21(a)(3)(iii), pharmaceutical agents are either excluded from the formulary entirely (if used exclusively for prohibited treatments) or they must be available on the uniform formulary for all eligible beneficiaries. There is no middle ground in the regulation for selective, beneficiary-based formulary exclusions. Since GLP-1 medications undisputably have multiple therapeutic uses, they cannot be excluded under § 199.21(a)(3)(iii), and must remain on the uniform formulary.

Fundamentally, DHA's argument perverts the entire purpose of § 199.21(a)(3)(iii) and the uniform formulary system. The regulation's plain language excludes pharmaceutical agents based on what medical condition is being treated (drugs used "exclusively" for "excluded" treatments), not based on which beneficiaries are seeking treatment. Yet the government's position does exactly the opposite -- it keeps GLP-1s on the formulary but denies access based solely on the patient's enrollment status. The statute mandates pharmaceutical selection based on "relative clinical and cost effectiveness" for therapeutic classes -- objective medical criteria, not beneficiary demographics. DHA's interpretation allows it to circumvent the uniform formulary's core purpose by maintaining drugs on the formulary while selectively denying them to disfavored groups – or because of budgetary concerns, transforming § 199.21(a)(3)(iii) from a narrow provision about truly single-purpose excluded drugs into a tool for beneficiary discrimination.

Simply put, by DHA's reasoning, § 199.4(g)(28) -- superseded by § 729 for all covered beneficiaries (except TFL), authorizes it to upset the mandate in 10 U.S.C. § 1074g/§ 199.21 for a uniform formulary based on clinical indications and parity access -- by redefining TFL beneficiaries as "medical treatments or procedures." The government's position would have this Court ignore the plain meaning of "exclusively" and "excluded" and substitute "when prescribed for TFL" – which is exactly with the post August 31, 2025, prior authorization forms do. This is an extraordinary contortion of clear and plain language.

## IV. 10 U.S.C. § 1079(A)(10) / 32 C.F.R. § 199.4(G)(28) INAPPLICABLE TO GLP-1 DRUGS COVERED THROUGH PRIOR AUTHORIZATION – <u>EVEN USING EXISTING LANGUAGE</u>

Before diving too deeply into this next argument, it is essential to recall that DHA's own regulations confirm the pharmacy program's independence. This acknowledgment proves what the statute mandates: the uniform formulary operates under its own authority, not subject to medical benefit exclusions codified elsewhere. And, with that:

Even if 10 U.S.C. § 1079(a)(10) had not been superseded by § 729, its exception that **"[t]reatment of obesity may not be provided if obesity is the sole or major condition treated"** -- as

implemented by 32 C.F.R. § 199.4(g)(28) prohibiting **"[s]ervice and supplies related "solely" to obesity or weight reduction or weight control"** is, by its plain and clear language, not applicable in the Plaintiff's circumstances or those of any TFL beneficiaries who satisfied TRICARE's prior authorization criteria for GLP-1 drugs prior to August 31, 2025. (Emphasis added, quotes in original)

The statutory bar in 10 U.S.C. § 1079(a)(10) is not an across-the-board prohibition on any healthcare associated with body weight; it is triggered only when **"obesity is the "sole or major condition treated."** (Obesity is defined as a body mass index (BMI) of $>= 30$ kg/m$^2$.) [9] That phrasing is much narrower than a categorical exclusion. It requires an inquiry into what conditions the physician actually treated. If, as in these circumstances, DHA's own prior-authorization criteria requires the presence of one or more comorbidities (e.g., type 2 diabetes, prediabetes, hypertension, dyslipidemia, obstructive sleep apnea (OSA), non-alcoholic fatty liver disease (NAFLD) / non-alcoholic steatohepatitis (NASH). These comorbidities effectively constitute metabolic dysfunction with cardiovascular sequelae – not simply "obesity." By design and definition per DHA's prior authorization criteria the drug is not being authorized to treat "obesity" ("or weight reduction or weight control") as the **sole** condition. And, for most applications of GLP-1 drugs, including in the Plaintiff's circumstances, there is a compelling argument it was not the **"major"** condition either, because the Plaintiff and most similarly situated patients are treated for multiple cardiometabolic conditions and risk factors. Stated differently, the plan's own prior authorization architecture shows the drug was never authorized or used for cosmetic weight loss, but for management of a cardiometabolic syndrome in which weight is one component among several clinically important conditions.

Even if one assumed 10 U.S.C § 1079(a)(10) were still viable regarding medical benefits despite § 729 or relevant in the pharmacy context (it is not, because drugs are governed by § 1074g/32 C.F.R. § 199.21), the government's argument gives the Court an independent ground to reject the DHA's reading.

---

[9] NHLBI Obesity Education Initiative Expert Panel on the Identification, Evaluation, and Treatment of Obesity in Adults (US). Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults: The Evidence Report. Bethesda (MD): National Heart, Lung, and Blood Institute; 1998 Sep.

DHA's position treats every GLP-1 prescription to a TFL beneficiary with any weight-related factor as treatment "for obesity" within the meaning of § 1079(a)(10) and then assumes obesity ("or weight reduction or weight control" - § 199.4(g)(28)) is the "sole or major" condition treated. That conclusion is neither compelled by the text nor consistent with how the benefit was administered prior to August 31, 2025. The November 30, 2023 Prior Authorization Form [10] required documentation of a non-obesity diagnosis; the labels and clinical practice guidelines targeted improvement in non-obesity endpoints; and requests were actually approved on that rationale. DHA cannot rewrite those facts retroactively to manufacture "obesity" or a "sole or major condition" predicate that did not exist. The post August 31, 2025, prior authorization form[11] differs only in that it adds a question asking which TRICARE plan the beneficiary is enrolled in. Nothing else changed. See pre August 31, 2025, prior authorization form.[12]

As for 32 C.F.R. § 199.4(g)(28), the Plaintiff asserts that DHA's enforcement of § 199.4(g)(28), as plainly written, both exceeds its authority under 10 U.S.C. § 1079(a)(10) and is inapplicable to Plaintiff and other TFL beneficiaries. As discussed above, the governing statute narrowly excludes "treatment for **obesity**" when "obesity is the **sole** or **major** condition treated." The regulation, however, both limits and expands the prohibition. It addresses "[s]ervices and supplies related "solely" to obesity or weight reduction or weight control ..." thereby limiting its application to "services and supplies" while simultaneously sweeping in preventive care and weight management for non-obese patients that Congress never intended to exclude.

If Congress intended to prohibit the provision of "services and supplies" for "weight reduction or weight control" from TRICARE coverage, it would have used that broader language rather than limiting

---

[10] https://www.express-scripts.com/frontendservice/proxinator/1/member/v1/drugpricing/prelogin/fst/drug/forms/content?documentId=%7BA0271D8C-0000-C91A-BE22-57AA8F31CF8A%7D&repository=EIS_P8_DC%3AesiCPS&utm

[11] https://www.express-scripts.com/interaction/member-proxinator/1/member/v1/drugpricing/prelogin/fst/drug/forms/content?documentId=%7BE050F798-0000-C91F-A9BC-1B7DAC245DA5%7D&repository=EIS_P8_DC%3AesiCPS

[12] https://www.express-scripts.com/interaction/member-proxinator/1/member/v1/drugpricing/prelogin/fst/drug/forms/content?repository=EIS_P8_DC:esiCPS&documentId=%7BE0E89991-0000-CF1F-9F1E-DF770B00E0D2%7D

the exclusion to "obesity" as a diagnosed condition. This unauthorized expansion provides yet another basis for preventing enforcement of § 199.4(g)(28) in its current form: the agency cannot enforce against TFL beneficiaries a regulatory provision that exceeds the scope of the statutory exclusion it purports to implement. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988).[13]

Even assuming § 199.4(g)(28) is viable, it prohibits only "services and supplies" related solely to obesity or weight reduction or weight control. Prescription drugs are not 'services and supplies'; they are pharmaceutical agents governed by the uniform formulary DHA's interpretation of the interplay between 10 U.S.C. § 1079(a)(10), 32 C.F.R. § 199.4(g)(28) and § 199.21(a)(3)(iii) is strained beyond all reason.

## V. DHA'S MEDICARE EXCUSE FAILS: TRICARE'S INDEPENDENT PHARMACY PROGRAM IS NOT BOUND BY MEDICARE'S EXCLUSIONS

The government asserts "that as the secondary payer, it cannot cover weight-loss drugs when Medicare does not." The government cites Brown, 2020 WL 6811121, at *11. This too is incorrect.

As noted above, TFL is the Department of Defense's Medicare-wraparound health plan for retired service members and other eligible beneficiaries entitled to Medicare Part A and enrolled in Part B. TFL beneficiaries are predominantly senior and disabled retirees. Under this framework, Medicare and TRICARE share responsibility for covered medical services according to a well-defined order of payment: Medicare pays first for medical services covered by both programs, TRICARE pays any residual balance. If a service is covered only by Medicare or only by TRICARE, each program pays solely for the benefits within its statutory authority. For pharmacy benefits, Medicare-eligible beneficiaries enrolled in TFL, who have not purchased Medicare Part D coverage, rely solely on TRICARE for pharmacy benefits. DHA expressly states that Medicare Part D is not required because the TRICARE Pharmacy Program already furnishes drug coverage -- further confirming that § 199.21 governs GLP-1 coverage independently of Medicare rules. (DHA Newsroom: "You don't need Medicare

---

[13] https://supreme.justia.com/cases/federal/us/488/204/

Part D to have TFL. That's because TFL has the same prescription drug coverage as other TRICARE health plans.").[14]

The government cites Brown to argue that TFL cannot receive coverage under the TRICARE Pharmacy Benefits Program when Medicare does not cover a drug. Brown v. United States, No. 3:17-cv-551-TSL-RHW, 2020 WL 6811121 (S.D. Miss. May 13, 2020). Brown is an FTCA damages-offset case; it did not construe § 1074g/§ 199.21, and it found future TFL payments too speculative even for offsets. It has nothing to say about formulary coverage between TRICARE and Medicare.

## VI. DHA'S CLAIM OF MINISTERIAL DUTY IS PRETEXTUAL: EIGHT YEARS OF CONTRARY PRACTICE EXPOSES NONDISCRETIONARY DISCRIMINATION.

The government argues that DHA is neither exercising discretion or making a policy judgment. The government asserts that it is simply enforcing the express prohibition in 32 C.F.R. § 199.4(g)(28) derived from 10 U.S.C. § 1079(a)(10).

DHA's characterization of its August 2025 action is belied by the timing, manner, and scope of the change, all of which – even if permissible under the governing statutes – would involve the exercise of substantive policy discretion requiring notice-and-comment rulemaking.

First, the temporal sequence is telling: DHA allowed TFL beneficiaries access to weight control medications for nearly eight years without blinking; through multiple P&T Committee reviews, formulary updates, and prior authorization renewals, only realizing the significance of § 199.4(g)(28) after a congressional inquiry (Declaration of Edward C. Norton) and budgetary impacts from GLP-1s were becoming apparent. This pattern -- longstanding agency practice abruptly reversed following political or budgetary pressure -- is the hallmark of discretionary policy change, not ministerial correction.

Second, the Norton Declaration reveals deliberative choice-making rather than mechanical implementation: Mr. Norton admits DHA "reviewed the prior authorization criteria and determined they were not sufficiently clear," this indicates evaluative judgment, not simply fixing a clerical oversight.

---

[14] https://newsroom.tricare.mil/News/TRICARE-News/Article/3472382/understanding-medicare-part-d-and-tricare-pharmacy-coverage

Third, if the August 31 action were truly a ministerial act applying unambiguous law, DHA could not have operated inexplicably for years. The very fact that the agency's subject matter experts, contractors, and legal counsel all permitted coverage to continue for eight years demonstrates that the decision to change required interpretation and policy judgment.

Fourth, DHA chose among multiple possible responses -- it might have offered to grandfather, phase in changes gradually, or interpret § 199.4(g)(28) superseded as it had for Prime/Select. Instead, DHA selected immediate termination of all TFL coverage, a policy choice affecting hundreds of thousands of beneficiaries and millions in federal spending. Agencies cannot evade APA requirements simply by claiming their discretionary policy judgments are "clarifications", particularly when those "clarifications" reverse years of consistent agency practice initiated only after congressional inquiry – or, more likely, realization of budget impacts.

Far from "simply enforcing" mandatory law, DHA's action represents an arbitrary and capricious expansion of statutory prohibitions beyond what Congress authorized, a failure to conform regulations to superseded statutes, and a results-driven reinterpretation motivated by budgetary concerns rather than legal mandate. Consider the following:

i. DHA failed to conform 32 C.F.R. § 199.4(g)(28)'s to § 729 to remove any vestigial prohibition affecting TFL. It latches onto that failure to argue that it is just enforcing a discriminatory result of its own fabrication. Arguing that it had the discretion to create plan-based discrimination, DHA cannot now claim it lacks discretion to correct a clear error and apply § 729 properly.

ii. DHA now seeks to enforce § 199.4(g)(28)'s to prohibit TFL access to drugs for a class of treatments in excess of 10 U.S.C. § 1079(a)(10)'s- limitation to treatments for "obesity" when "obesity" is the "sole or major condition." It now includes "weight reduction or weight control" treatment. And, DHA now argues that it can reach prescription drugs, far beyond § 199.4(g)(28)'s prohibition affecting "services and supplies."

iii. After eight years of failing to enforce, or, apparently, even notice § 199.4(g)(28) – it took a congressional inquiry and the din of research highlighting both the value and cost of GLP-1 drugs, to awaken DHA to its error.

iv. Rather than managing the "discovery" of its error through the public notice and comment process, or even involving the P&T Committee or UF-PAB as required by law, it announced, with thirty-days' notice, that it would stop covering GLP-1s for TFL. Why? Because DHA knew the decision would not survive sunlight.

An agency cannot claim to be acting "ministerially" and in good faith when it attempts to enforce a rule that has, by its own interpretation, been superseded, and then opportunistically contorts its failures to deprive disabled and senior retirees of statutory benefits. This is the type of policy reversal and post-hoc rationalization that should be condemned as arbitrary and capricious. This is agency conduct deserving of no deference or respect.

## VII. DHA'S PROCEDURAL VIOLATIONS CONFIRM BAD FAITH: BYPASSING MANDATORY REVIEW TO HIDE DEFECTIVE REASONING.

Independently dispositive -- DHA violated mandatory procedural requirements before making this decision. On March 10, 2025, the Secretary of Defense directed a pause of all DoD Advisory Committees, which included the Uniform Formulary Beneficiary Advisory Panel (UF-BAP). Prominently displayed on the DoD Pharmacy and Therapeutics Committee website, DHA acknowledges that the law mandates that pharmacy coverage decisions be made through the P&T Committee with UF-BAP input, with minutes kept and written decisions issued. [15] 10 U.S.C. § 1074g(b) and (c), and 32 C.F.R. § 199.21(e), (g)(1)-(3). This:

> On March 10, 2025, the Secretary of Defense directed a pause of all DOD Advisory Committees, including the Uniform Formulary Beneficiary Advisory Panel meeting. As a result, the upcoming UF BAP meeting is delayed, and posting of the February 2025, May 2025, and August 2025 P&T Committee meeting minutes will be delayed. **Congressional mandate requires that the UF BAP comment publicly on the DD P&T Committee recommendations, prior to signing by the Director, DHA.** Until the UF BAP is re-

---

[15] https://www.health.mil/Military-Health-Topics/Access-Cost-Quality-and-Safety/Pharmacy-Operations/DOD-PT-Committee

established, the DOD P&T Committee meeting minutes are not available. Please check the UF BAP website page for any updates on upcoming UF BAP meeting dates.

(Emphasis added.)

No P&T Committee or UF-BAP input informed DHA's decision to end coverage. [16] Due to the lack of membership in the UF BAP, the panel made zero (0) recommendations during FY 2025, to address the FY 2025 DoD Pharmacy and Therapeutics Committee meetings.[17]

The statute provides:

(b) The Secretary of Defense shall, … establish a Pharmacy and Therapeutics Committee for the purpose of developing the uniform formulary of pharmaceutical agents required by subsection (a), reviewing such formulary on a periodic basis, and making additional recommendations regarding the formulary as the committee determines necessary and appropriate. … The committee shall function under procedures established by the Secretary under the regulations prescribed under subsection (j).

\* \* \*

(c) Concurrent with the establishment of the Pharmacy and Therapeutics Committee under subsection (b), the Secretary shall establish a Uniform Formulary Beneficiary Advisory Panel to review and comment on the development of the uniform formulary. **The Secretary shall consider the comments of the panel before implementing the uniform formulary or implementing changes to the uniform formulary.**

10 U.S. Code § 1074g(b)(c). (Emphasis added.)

And, the regulation provides:

Department of Defense Pharmacy and Therapeutics Committee
Purpose. The Department of Defense Pharmacy and Therapeutics Committee is established by 10 U.S.C. 1074g to assure that the **selection of pharmaceutical agents for the uniform formulary is based on broadly representative professional expertise concerning relative clinical and cost effectiveness of pharmaceutical agents** and accomplishes an effective, efficient, integrated pharmacy benefits program.

\* \* \* \*

32 CFR 199.21(c). (Emphasis added.)

Uniform Formulary Beneficiary Advisory Panel. As required by 10 U.S.C. 1074g(c), a Uniform Formulary Beneficiary Advisory Panel reviews and comments on the development of the uniform formulary. The Panel includes members that represent … associations that represent the views and interests of a large number of eligible covered

---

[16] DHA publishes records of the meetings of the DOD Pharmacy & Therapeutics (P&T) Committee and the Uniform Formulary Beneficiary Advisory Panel (UF-BAP) on its website at https://www.health.mil, in compliance with the Federal Advisory Committee Act, 5 U.S.C. app. 2 § 10(a)–(b). Records for the P&T Committee meetings are available from 1998 through November 7, 2024, and for the UF-BAP from 2005 through December 18, 2024.
[17] https://www.facadatabase.gov/FACA/apex/FACACommitteeLevelReportAsPDF?id=a10t0000001gzjMAAQ

beneficiaries ... **The Panel's comments will be submitted to the Director, TRICARE Management Activity. The Director will consider the comments before implementing the uniform formulary or any recommendations for change made by the Pharmacy and Therapeutics Committee.** The Panel will function in accordance with the Federated Advisory Committee Act (5 U.S.C. App. 2).

32 CFR 199.21(d). (Emphasis added.)

\* \* \* \*

Uniform formulary final decisions. The Director of the TRICARE Management Activity makes the final DoD decisions regarding the uniform formulary. Those decisions are based on the Director's review of the final determinations of the Pharmacy and Therapeutics Committee and the comments and recommendations of the Beneficiary Advisory Panel. **No pharmaceutical agent may be designated as non-formulary on the uniform formulary unless it is preceded by such recommendation by the Pharmacy and Therapeutics Committee.** The decisions of the Director of the TRICARE Management Activity are in writing and establish the effective date(s) of the uniform formulary actions.

32 CFR 199.21(g)(3). (Emphasis added.)

Prior authorization criteria are not mere administrative details -- they are the operational mechanism through which the uniform formulary functions and determines which beneficiaries can access covered medications. When DHA modified these PA forms to categorically exclude an entire class of beneficiaries (TFL) from drugs that are accessible under the formulary, it made a substantive change to the uniform formulary's operation. Such changes fall squarely within the statutory mandate requiring UF-BAP review under 10 USC 1074g, regardless of DHA's attempt to characterize them as mere "clarifying revisions." The Declaration of Norton admits that DHA "made clarifying revisions to the prior authorization forms" that had the effect of excluding TFL beneficiaries from GLP-1 weight loss drug coverage they had been receiving. (As noted earlier, these "clarifications" consisted solely of a question asking which TRICARE plan the patient was enrolled in.) That failure alone requires the action be set aside and remanded. See Azar v. Allina Health Services, 139 S. Ct. 1804, 1810-12 (2019) (substantive coverage changes require proper procedures); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268 (1954) (agency must follow its own regulations

The procedural violations are not mere technicalities. Had DHA followed required procedures -- including P&T Committee and UF-BAP review -- it would have been forced to publicly explain why it was selectively forcing an prohibition on TFL it had determined was superseded for Prime/Select.

Agencies confident in their legal position follow required procedures. Agencies making unauthorized changes try to avoid scrutiny by calling them "ministerial."

## VIII. PLAINTIFF MEETS ALL ELEMENTS FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION

i. Summary judgment is warranted when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The material facts here are undisputed. DHA provided GLP-1 medications to TFL beneficiaries from 2017 through August 31, 2025, administering these medications under uniform prior authorization criteria that applied equally to Prime, Select, and TFL beneficiaries. On March 10, 2025, the Secretary paused all DoD Advisory Committees, including the mandatory P&T Committee and UF-BAP, and that while these committees remained suspended, DHA implemented what it termed "clarifying revisions," effective August 31, 2025, that excluded TFL beneficiaries from coverage. No notice and comment rulemaking occurred, no Federal Register publication was made, and no committee recommendations supported this change in pharmacy benefits affecting 2.5 million beneficiaries. The only disputes between the parties involve legal conclusions about whether DHA's actions violated statutory mandates – substantive and procedural - and satisfied APA review standards. These are pure questions of law appropriate for resolution on summary judgment.

ii. <u>Clear Statutory Violations Require Judgment for Plaintiff Under De Novo Review.</u> Following Loper Bright, this Court exercises independent judgment in interpreting the governing statutes without deference to DHA's interpretation. The statutory violations are manifest and dispositive. Congress explicitly mandated in 10 U.S.C. § 1086(a) that TFL beneficiaries receive "the same" insurance and health plans as those provided under section 1079(a). The statutory text uses mandatory language -- the Secretary "shall contract" for "the same" benefits. The uniform formulary requirement in 10 U.S.C. § 1074g reinforces this mandate. Congress directed the Secretary to establish "a uniform formulary of pharmaceutical agents" that "shall be available to eligible covered beneficiaries." The statute contemplates only clinical and therapeutic distinctions based on "relative clinical and cost effectiveness,"

not beneficiary-based discrimination. Nothing in § 1074g authorizes evaluating drugs differently based on whether the beneficiary is enrolled in Prime, Select, or TFL.

Congress's is equally clear through NDAA 2017 § 729, which superseded the obesity exclusion for all "covered beneficiaries" in the "TRICARE Program." DHA's own acknowledgment of this supersession -- demonstrated by implementing coverage for Prime and Select beneficiaries through § 199.17(f)(3) -- establishes that the exclusion no longer applies. The government's Federal Register notice explicitly recognized that NDAA § 729 "specifically authorizes medical intervention for obesity" and allows coverage of these services. Having acknowledged the supersession and implemented it for younger beneficiaries, DHA cannot now claim the exclusion remains viable only for TFL beneficiaries. This selective implementation violates the fundamental principle that agencies must apply Congressional mandates uniformly, not pick and choose which beneficiaries receive statutorily-mandated benefits.

DHA's exclusion of 2.5 million beneficiaries from formulary access represents a decision of vast economic and political significance that triggers the major questions doctrine articulated in West Virginia v. EPA. Congress does not hide elephants in mouseholes, and excluding one-third of TRICARE beneficiaries from pharmaceutical coverage requires clear congressional authorization that is entirely absent here. DHA cannot point to any statutory provision authorizing plan-based formulary discrimination. Instead, the agency relies on its own regulation, 32 C.F.R. § 199.17(f)(3), which by its express terms applies only to Prime and Select enrollees. The regulation's savings clause explicitly states that nothing in § 199.17 alters rules pertaining to TFL, yet DHA attempts to use this inapplicable regulation to justify TFL exclusion. An agency cannot exceed statutory limits through creative regulatory interpretation. Congress established clear boundaries: the same benefits for all beneficiaries and a uniform formulary without plan-based distinctions. DHA's attempt to create different formularies for different plans exceeds any authority Congress granted and violates fundamental principles of administrative law established in Bowen v. Georgetown University Hospital.

iii. DHA's Action Is Arbitrary and Capricious Under State Farm Analysis. Even if this Court were to find statutory ambiguity, which Plaintiff strongly disputes, DHA's action cannot survive arbitrary and

capricious review. Under Motor Vehicle Manufacturers Ass'n v. State Farm, an agency rule is arbitrary and capricious if the agency relied on factors Congress did not intend it to consider, entirely failed to consider important aspects of the problem, offered an explanation that runs counter to the evidence, or reached a decision so implausible it could not be ascribed to agency expertise.

DHA's exclusion for TFL fails every aspect of this test. The agency relied on an impermissible factor -- beneficiary plan type -- that Congress explicitly rejected by mandating a uniform formulary for all eligible covered beneficiaries. Congress intended formulary decisions to be based solely on the relative clinical and cost effectiveness of pharmaceutical agents, not on the age or enrollment status of beneficiaries seeking treatment. By creating a plan-based carve-out, DHA considered precisely the factor Congress intentionally excluded from formulary determinations.

The agency entirely failed to consider critical aspects of the problem before it. DHA gave no consideration to the eight-year reliance interest of TFL beneficiaries who had maintained continuous treatment based on consistent coverage. The agency ignored the documented medical consequences of forced medication discontinuation for patients with chronic conditions, consequences well-established in peer-reviewed medical literature. DHA failed to consider that its action discriminates solely against Medicare-eligible beneficiaries – disabled and senior retirees -- while maintaining coverage for younger servicemembers. The agency also failed to evaluate less restrictive alternatives, such as enhanced prior authorization criteria that would apply uniformly to all beneficiaries regardless of plan enrollment.

Most tellingly, DHA's explanation runs directly counter to the evidence in the public record. The agency claims it is merely correcting an eight-year error, yet the record is devoid of any contemporaneous documentation from 2017 through 2024 suggesting coverage was unauthorized or problematic. But, on or before January 2024, DHA leadership was made aware of significant budgetary pressures from GLP-1 drug utilization, as evidenced by a Military Health System report published that month documenting a nearly 100-fold increase in weight loss medication prescriptions among active-duty personnel (from 1.2 to 104.4 per 100,000 members between 2018 and mid-2023) (Lorei, et al., "Weight Loss Medication

Prescription Prevalence in the Active Component, 2018-2023," MSMR, January 20, 2024,)[18]. The CDC estimated obesity-related military healthcare costs at $1.5 billion annually (Centers for Disease Control and Prevention, "Unfit to Serve," CDC.gov, June 20, 2023)[19], and University of Chicago researchers projected that expanding federal coverage for GLP-1 weight loss medications would result in net spending of $47.7 billion over 10 years (Hwang, et al., "Fiscal Impact of Expanded Medicare Coverage for GLP-1 Receptor Agonists to Treat Obesity," JAMA Health Forum, Apr 25, 2025)[20]. This temporal sequence -- longstanding practice reversed immediately after political pressure, public research demonstrating budgetary impacts and committee suspension -- reveals post-hoc rationalization rather than reasoned decision-making in compliance with the law. All evidence points conclusively to post hock rationalization which courts reject under SEC v. Chenery Corp., 318 U.S. 80 (1943).

    iv. <u>The Substantive Defects Cannot Be Cured</u>.

    In 10 U.S.C. § 1074g(b) Congress mandated that formulary changes undergo review by the Pharmacy and Therapeutics Committee, comment by the Uniform Formulary Beneficiary Advisory Panel, and final decision by the Director based on these recommendations. DHA violated all three requirements by implementing the TFL exclusion while these committees were suspended by the Secretary. DHA's procedural violations enabled the substantive violations, and both require reversal.

    Beyond the statutory requirements, DHA violated the Administrative Procedure Act's notice and comment requirements. Excluding 2.5 million beneficiaries from pharmaceutical coverage constitutes a substantive rule that significantly affects beneficiary rights and interests. Such a rule requires publication in the Federal Register, opportunity for public comment, and reasoned responses to significant comments received. DHA provided none of these, instead characterizing a fundamental coverage exclusion as a mere "clarifying revision" to its prior authorization form. Courts consistently reject such attempts to evade APA requirements through mislabeling.

---

[18] https://www.health.mil/News/Articles/2024/01/01/MSMR-Weight-Loss-Rx
[19] https://www.cdc.gov/physicalactivity/resources/unfit-to-serve/index.html
[20] https://jamanetwork.com/journals/jama-health-forum/fullarticle/2833038

### v. All Requirements for Permanent Injunctive Relief Are Satisfied

The four-factor test for permanent injunctive relief established in eBay and refined for APA cases in Monsanto strongly favors Plaintiff.

Regarding irreparable injury, Plaintiff faces ongoing, noncompensable harm from denial of coverage for physician-prescribed medication. Courts consistently recognize that disruption of medically necessary care constitutes irreparable harm -- as the Fourth Circuit held in Pashby v. Delia, 709 F.3d 307 (4th Cir. 2013). (See also DE 55.) The medical literature documents that discontinuation of GLP-1 medications leads to metabolic rebound, weight regain, and deterioration of cardiometabolic control. These are not speculative harms but documented medical consequences that Plaintiff and 2.5 million similarly situated beneficiaries face. Beyond the physical harm, the denial of statutory rights constitutes irreparable injury per se, particularly when those statutory rights were earned through military service.

Legal remedies are inadequate as a matter of law. The APA provides no damages remedy; only declaratory and injunctive relief are available under 5 U.S.C. §§ 702 and 706. Money damages, even if available, could not compensate for lost therapeutic benefit, reversed health improvements, or the ongoing denial of statutory entitlements. The inadequacy of legal remedies is categorical in APA cases challenging ongoing agency action.

The balance of hardships tips decisively in Plaintiff's favor. On one side stands the significant harm from denial of coverage affecting the Plaintiff and 2.5 million disabled and senior veterans. On the other side, the government faces only the burden of complying with its own statutes and regulations -- maintaining the status quo ante that existed before August 31, 2025. Requiring an agency to follow the law is not a cognizable hardship.

Moreover, DHA's own analysis showed that GLP-1 coverage demonstrated "significant cost avoidance for the MHS." Furthermore, the Department of Defense Medicare-Eligible Retiree Health Care Fund was fully funded for both FY 2025 ($13.838B) and FY 2026 ($14.104B)[21] based on budget requests

---

[21] FY 2025 Appendix (Other Defense—Civil Programs):
https://www.govinfo.gov/content/pkg/BUDGET-2025-APP/pdf/BUDGET-2025-APP-1-21.pdf

developed and submitted while DHA contemplated this exclusion. The government cannot claim fiscal hardship from maintaining coverage it already budgeted for and that its own analysis shows saves money for the military health system.

The public interest overwhelmingly supports injunctive relief. As the Fourth Circuit recognized in League of Women Voters, 769 F.3d 224 (4th Cir. 2014), the public interest is always served by requiring government compliance with law. Here, that interest is particularly compelling given Congress's promise that disabled and senior veterans would receive the same pharmaceutical benefits as their younger counterparts. Today it is GLP-1 medications; tomorrow it could be cancer drugs, cardiac medications, or any other treatment. This Court should not endorse age-based healthcare rationing for those who earned their benefits through a career of military service.

vi. Remand Would Be Futile and Complete Relief Is Warranted. Under Monsanto, while courts should not automatically issue permanent injunctions for procedural violations that could be cured on remand, permanent relief remains appropriate where the agency action violates substantive statutory commands, where the agency lacks authority to reach a different result, or where continuing harm would occur during remand proceedings. All three circumstances exist here.

This case involves statutory violations, not just substantive procedural defects. Remand would be futile because DHA lacks authority to reach a different result. The agency has no discretion to fracture the uniform formulary or provide different benefits based on plan enrollment. As the D.C. Circuit recognized in Allied-Signal, remand serves no purpose where vacating an agency's action could not conceivably lead to a different result. Congress has already determined the outcome through clear statutory mandates -- uniformity and parity, not discrimination. Moreover, DHA's own implementation of § 729 for Prime/Select demonstrates it has already made the interpretive choice. To allow remand would permit DHA to simply re-issue the same decision with procedural window-dressing, a result Congress's clear

---

FY 2026 Appendix (Other Defense—Civil Programs):
https://www.govinfo.gov/content/pkg/BUDGET-2026-APP/pdf/BUDGET-2026-APP-2-21.pdf

mandates do not permit. No amount of committee review or public comment can authorize what Congress prohibited.

Irreparable harm continues daily during any remand proceedings. Every day of delay perpetuates medical harm to beneficiaries forced to discontinue or unable to access prescribed medications – statutory benefits. This Court should not require years of administrative proceedings to reach the only outcome the statutes permit. After eight years of coverage creating legitimate medical reliance and settled expectations, remanding for agency "reconsideration" would be particularly inappropriate.

Most fundamentally, DHA created discrimination through its own implementation choices in § 199.17(f)(3), then claims that discrimination justifies further discrimination against TFL beneficiaries. An agency cannot bootstrap its way out of statutory violations through administrative circularity. The proper remedy is to break the circle by enforcing the statutory mandates Congress enacted.

The undisputed material facts and governing law compel summary judgment for Plaintiff. DHA violated clear statutory mandates requiring the same benefits for all TRICARE beneficiaries and a uniform formulary without plan-based discrimination. The agency acted arbitrarily and capriciously by reversing eight years of consistent coverage while mandatory oversight committees were suspended, offering only post-hoc rationalizations that contradict the administrative record. Multiple procedural violations prevented the scrutiny that would have exposed these substantive defects.

This Court should grant summary judgment, declare DHA's August 31, 2025 exclusion unlawful under 5 U.S.C. § 706(2), vacate the discriminatory policy, and permanently enjoin its enforcement. The Court should restore the status quo ante, requiring DHA to administer GLP-1 medications under the uniform formulary with pre-August 31 prior authorization criteria applied uniformly to all beneficiaries regardless of plan enrollment. Any future changes must proceed through the statutorily-mandated P&T Committee and UF-BAP process with proper notice and comment. Only this complete relief can remedy the ongoing violation of statutory rights earned by 2.5 million senior and disabled veterans through their service to our nation.

## RELIEF REQUESTED

Plaintiff respectfully requests that the Court enter judgment for Plaintiff and grant the following relief:

I. Vacatur (APA). Under 5 U.S.C. § 706(2), set aside and vacate Defendants' August 31, 2025 action that excludes TRICARE For Life ("TFL") beneficiaries from coverage of GLP-1 medications for FDA-approved weight-management indications while maintaining coverage for other TRICARE beneficiaries.

II. Permanent Injunction (Parity/Uniformity). Permanently enjoin Defendants and their officers, employees, agents, contractors, and all persons in active concert or participation with them from enforcing any plan-based restriction that denies TFL beneficiaries coverage of GLP-1 medications on terms less favorable than those applicable to TRICARE Prime/Select beneficiaries, and require Defendants to administer coverage under the uniform formulary using plan-neutral prior-authorization criteria, unless and until Defendants lawfully adopt different, plan-neutral criteria consistent with 10 U.S.C. § 1074g and 32 C.F.R. § 199.21.

III. Process-conditioned Prospective Relief. Enjoin Defendants from implementing any change to GLP-1 formulary status, indication-level prior authorization, or beneficiary access by plan-based exclusion or by contractor form; any such change must follow the § 1074g / § 199.21 pathway (P&T Committee review, UF-BAP public comment, and Director decision).

IV. Reinstatement/Reprocessing. Order Defendants, within 30 days, to (a) reinstate any GLP-1 prior authorizations for TFL beneficiaries that were terminated based on the August 31, 2025 action, and (b) reprocess prescriptions/requests denied on or after August 31, 2025 under plan-neutral prior-authorization criteria no more restrictive than those applied to Prime/Select beneficiaries.

V. Declaratory Judgment. Declare that Defendants' August 31, 2025 action is contrary to law and arbitrary and capricious in violation of the APA and is inconsistent with the uniform formulary mandate of 10 U.S.C. § 1074g and 32 C.F.R. § 199.21.

VI. Implementation/Notice. Require Defendants, within 14 days, to issue program guidance to their pharmacy benefit manager and network pharmacies reflecting the relief granted and the operative plan-neutral criteria.

VII. Fees and Costs. Award Plaintiff costs.

VIII. Retention of Jurisdiction. Retain jurisdiction for 120 days to resolve disputes regarding implementation of this judgment and order.

CONCLUSION

This case exposes a fundamental betrayal of medically retired ("disabled") veterans and those over 65. DHA's August 31, 2025 exclusion of TRICARE For Life beneficiaries from GLP-1 medications available to younger servicemembers violates multiple independent legal mandates and reveals an agency acting in bad faith to achieve budgetary savings on the backs of those who served.

The government's defense rests on a house of cards. After concluding that NDAA 2017 § 729 superseded the obesity exclusion -- demonstrated by implementing coverage for Prime and Select beneficiaries through § 199.17(f)(3) -- DHA now claims its own decision to limit that implementation justifies an exclusion for TFL beneficiaries. This bootstrapping violates fundamental principles of administrative law: an agency cannot use its own discriminatory implementation choices to justify further discrimination.

The statutory violations are clear and undisputed:

First, the uniform formulary mandate in 10 U.S.C. § 1074g requires pharmaceutical agents be available to all "eligible covered beneficiaries" -- not just those under 65. Congress created no exception for plan-based discrimination.

Second, even accepting DHA's framework, 32 C.F.R. § 199.21(a)(3)(iii) only excludes drugs used "exclusively" for prohibited purposes. GLP-1 medications have multiple FDA-approved indications. The government's own continued coverage for diabetes proves these drugs are not used "exclusively" for weight management.

Third, DHA violated every procedural safeguard Congress mandated. No P&T Committee review. No UF-BAP input. No notice and comment. No Federal Register publication. These violations occurred while the Secretary had paused the committees required to review formulary changes -- timing that suggests consciousness of wrongdoing.

Fourth, eight years of providing coverage to TFL beneficiaries demonstrates this was not error correction but discriminatory policy change requiring proper procedures. DHA cannot retroactively manufacture a legal problem it ignored for nearly a decade.

The government asks this Court to bless age and disability-based healthcare rationing within TRICARE. It seeks judicial endorsement of a two-tier system where a 64-year-old veteran receives comprehensive pharmaceutical coverage but loses it if disabled or at 65 solely due to Medicare eligibility. This violates Congress's promise when creating TFL: that senior beneficiaries would maintain access to the same pharmaceutical benefits as their younger counterparts.

Plaintiff faces irreparable harm from forced discontinuation of physician-prescribed medication with documented medical consequences. The government faces only the burden of following its own regulations and honoring commitments made to veterans. The equities could not be more one-sided.

This Court should not permit DHA to achieve through administrative manipulation what Congress never authorized: the fracturing of the uniform formulary based on age and enrollment status. The government's attempt to save money by denying earned benefits to senior veterans while maintaining those same benefits for younger beneficiaries is arbitrary, capricious, and unlawful.

For these reasons, Plaintiff respectfully requests that this Court grant summary judgment, declare DHA's August 31, 2025 exclusion unlawful, vacate the discriminatory policy, and restore pharmaceutical access to 2.5 million senior and disabled veterans whose service earned them these statutory rights.

**Respectfully submitted,**                                         November 24, 2025

Derence V. Fivehouse, Pro Se
316 Seaview Drive
Edenton, NC 27932
Phone: (703) 220-3227

Email: derencefivehouse@gmail.com

## CERTIFICATE OF MAILING

I hereby certify that on the date shown above, I deposited in the United States Mail, postage prepaid, a

true and correct copy of the foregoing, addressed to counsel of record for the United States, including

AUSA Rudy E. Renfer, Office of the United States Attorney for the Eastern District of North Carolina,

and to any other counsel who have appeared.  The foregoing was also emailed to Mr. Renfer at

Rudy.E.Renfer@us.doj.gov and to counsel for the Department of Defense and Defense Health Agency at

osd.pentagon.ogc.list.correspondence-staff@mail.mil.

Derence V. Fivehouse