FIRST-CLASS

US POSTAGE PITNEY BOWES

ZIP 28401
02 7H
0006079889   APR 28 2026

$ 002.44

Derence V. Fivehouse
316 Seaview Drive
Edenton, NC 27932

NIXIE      274   DE 1700      0006/23/26

RETURN TO SENDER
NO SUCH NUMBER
UNABLE TO FORWARD

BC: 28401398699      2027N174153-00667

RECEIVED

JUN 29 2026

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:25-CV-00041-M

**Derence V. Fivehouse**,

Plaintiff,

v.

**Order**

**U.S. Department of Defense**, et al.,

Defendants.

This case presents a question arising with alarming frequency in courts across the country: what should a court do when an attorney submits a brief containing fabricated legal authority and attributes the errors to the use of generative artificial intelligence? The answer is straightforward. The court should hold the attorney accountable because he is responsible for the authorities he presents to the court, regardless of they came to appear in the brief.

The record establishes, clearly and convincingly, that former Assistant United States Attorney Rudy Renfer knowingly submitted a brief containing fabricated quotations and misstatements of case holdings. These errors arose because Renfer used a generative AI tool to draft the brief but failed to verify the accuracy of its contents. That conduct is an abuse of the judicial process and warrants imposing sanctions under the court's inherent authority. Given the seriousness of the misconduct, Renfer's lack of candor, and the position of trust he held, serious sanctions would ordinarily be justified to vindicate the integrity of the judicial process and deter similar conduct. But in light of the professional consequences he has already suffered, the Court will limit its sanction to a public reprimand.

## I.    Background

Plaintiff Derence V. Fivehouse has sued under the Administrative Procedure Act challenging a change to medication covered under the Department of Defense's TRICARE program. Compl., D.E. 1. Late last year, Fivehouse sought to supplement the administrative record. Mot. to Suppl. Admin. R., D.E. 82. Defendants, through then-Assistant United States Attorney Rudy E. Renfer, opposed that request. Resp. in Opp'n Mot. to Suppl. Admin. R., D.E. 86.

In his reply, Fivehouse raised issues with Renfer's response. Reply Mot. to Suppl. Admin. R. at 4–5, D.E. 89. He noted that it included fabricated quotations and misrepresented the holdings of cases. *Id.*

The Court's review showed that Fivehouse was right. To begin with, there are several issues with Renfer's citation to the Fourth Circuit's opinion in *Ohio Valley Environmental Coalition* v. *Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009). *Ohio Valley* involved a challenge to a permitting decision by the United States Army Corps of Engineers under the Clean Water Act, 33 U.S.C. § 1251, and the National Environmental Policy Act, 42 U.S.C. § 4321. *Id.* at 186. It contains the following limited discussion of the administrative record

> We acknowledge the importance of extra-record evidence in NEPA cases to inform the court about environmental factors that the agency may not have considered. While review of agency action is typically limited to the administrative record that was available to the agency at the time of its decision, a NEPA suit is inherently a challenge to the adequacy of the administrative record. That is why, in the NEPA context, "courts generally have been willing to look outside the record when assessing the adequacy of an EIS or a determination that no EIS is necessary."

*Id.* at 201 (citations omitted).

Renfer cited the case for the proposition that, "The Fourth Circuit has consistently applied these principles, holding that APA review 'is limited to the administrative record that was before the agency at the time of its decision.'" Resp. in Opp'n at 2–3 (citing to *Ohio Valley*, 556 F.3d at 201). While the opinion contains similar language, at best, Renfer misquoted it.

2

Case 2:25-cv-00041-M-RN    Document 129    Filed 04/28/26    Page 2 of 18
Case 2:25-cv-00041-M-RN    Document 135    Filed 06/29/26    Page 3 of 19

The problems did not end there. Renfer claimed that in *Ohio Valley* "the court rejected claims that the record must be incomplete where plaintiffs offered no evidence that specific materials were omitted." Resp. in Opp'n at 5. But as shown above, that premise is not part of *Ohio Valley*'s discussion of the administrative record.

Renfer next claimed that in *Ohio Valley*, the Fourth Circuit "explained that '[m]ere allegations' or assumptions about what the agency 'must have considered' do not rebut the presumption of completeness." Resp. in Opp'n at 5 (alteration in the original). But neither the term "mere allegations," nor the phrase "must have considered" appear anywhere in *Ohio Valley*. The case also does not address the presumption of completeness or the impact of a party's allegations or assumptions about materials the agency considered.

Finally, in a portion of his brief discussing the "limited circumstances where extra-record materials may be considered," Renfer cited to page 201 of *Ohio Valley* and included a parenthetical indicating that the opinion stood for the premise that "[s]peculation that additional documents 'may exist' does not justify supplementation." Resp. in Opp'n at 6. Yet neither that premise, nor the words "may exist" appear in *Ohio Valley*.

There are also issues with Renfer's citations to *Dow AgroSciences, LLC* v. *National Marine Fisheries Service*, 637 F.3d 259 (4th Cir. 2011). In *Dow AgroSciences*, the Fourth Circuit considered whether an opinion "issued by the National Marine Fisheries Service to the Environmental Protection Agency (EPA) . . . is subject to judicial review in the district court under the Administrative Procedure Act (APA)." *Id.* (citation omitted). The opinion does not involve supplementation of the administrative record.

3

Case 2:25-cv-00041-M-RN    Document 129    Filed 04/28/26    Page 3 of 18
Case 2:25-cv-00041-M-RN    Document 135    Filed 06/29/26    Page 4 of 19

At one point, Renfer cited the case and included a parenthetical quotation that said, "[t]he APA does not provide for a broad right of discovery." Resp. in Opp'n at 7 (citing to *Dow AgroSciences*, 637 F.3d at 268). That quotation appears nowhere in *Dow AgroSciences*.

Renfer also cited *Dow AgroSciences* and included a parenthetical claiming in that case, the Fourth Circuit affirmed the "denial of extra-record evidence where plaintiffs sought to challenge the agency's reasoning rather than the completeness of the record." *Id.* at 4 (citing to *Dow AgroSciences*, 637 F.3d at 268–69). But the Fourth Circuit did no such thing in *Dow AgroSciences*. And the cited portion of that case has nothing to do with whether it was appropriate to consider evidence outside the administrative record.

*Dow AgroSciences* appears a final time in Renfer's brief when he cites the case and includes a parenthetical claiming that the Fourth Circuit rejected "supplementation where the issues were legal and policy-based, not technical." *Id.* at 6 (citing to *Dow AgroSciences*, 637 F.3d at 269). Yet again, that premise is not part of the opinion.

Renfer's citation to *Sierra Club* v. *United States Department of the Interior*, 899 F.3d 260 (4th Cir. 2018), suffers from similar issues. At one point he cites to pages 295 and 296 of the opinion for the contention that "[e]xtra-record evidence is not permitted merely because plaintiffs believe additional materials would be helpful." Resp. in Opp'n at 4–5. But *Sierra Club* ends on page 295, so that contention could not appear on page 296. And as with *Ohio Valley* and *Dow AgroSciences*, the premise in Renfer's parenthetical appears nowhere in the opinion.

The Court ordered Renfer to respond to Fivehouse's allegations. Order, D.E. 98. The Court also required the Clerk of Court to serve a copy of the order on the United States Attorney for the Eastern District of North Carolina and the First Assistant United States Attorney. *Id.*

A few days later, K. Paige O'Hale, then the Chief of the United States Attorney's Office's Civil Division, appeared in the case and sought an extension of time to respond. Mot. for Ext. of Time, D.E. 100. The request noted that Renfer was "out of the country on leave without access to his government computer and cell phone[.]" *Id.* ¶ 2. O'Hale said that after reviewing the relevant filings she "determined that AUSA Renfer needs to review Plaintiff's allegations and prepare Defendants' response." *Id.* The Court granted that request. Order, D.E. 101

In his response, Renfer claimed that he "inadvertently included incorrect citations to case law from this Circuit." Surreply at 1, D.E. 109. He maintained that "[t]he error was clerical in nature and resulted from the inadvertent filing of an unfinalized draft document." *Id.* He asked the Court to either strike the fabrications and misstatements or accept a substitute document that he claimed was "the document Defendants intended to file as a response." *Id.* at 3.

Notably, his submission made no mention of the use of generative AI in drafting any of the filings mentioned in the show cause order.

The Court then ordered Renfer and the United States Attorney's Office to appear and show cause why they should not be sanctioned for Renfer's conduct under either Rule 11 or the Court's inherent authority. O.S.C., D.E. 119. Shortly thereafter, a new attorney, Neal Fowler, took Renfer's place as defense counsel. Notice of Substitution of Counsel, D.E. 122.

At the show cause hearing, after a brief statement from Fowler, the United States Attorney for the Eastern District of North Carolina addressed the Court. He began by apologizing to the Court for Renfer's "unacceptable" conduct. Mar. 10, 2026 Hr'g Tr. at 6:10–13, D.E. 127. He then noted that his office "recognized that there was a problem" when the Court ordered that Renfer respond to Fivehouse's allegations. *Id.* at 6:14–16. The office's leadership found Renfer's explanation to be "unusual" and "it did not appear to be in order[.]" *Id.* at 6:16–19. In the weeks

5

Case 2:25-cv-00041-M-RN    Document 129    Filed 04/28/26    Page 5 of 18
Case 2:25-cv-00041-M-RN    Document 135    Filed 06/29/26    Page 6 of 19

between the filing of the Surreply and the show cause hearing, the United States Attorney's Office had been in contact with the United States Department of Justice's General Counsel's Office, as well as its Office of Professional Responsibility about this matter. *Id.* at 6:20–7:6.

The United States Attorney also shared that after the Court issued its show cause order, he issued a memorandum to his office. That memo reminded his staff "of the importance of perpetual full compliance with the Rules of Professional Conduct." Memo from W. Ellis Boyle at 1 (Mar. 4, 2026). It emphasized the "utmost importance" of "maintain[ing] absolute candor to the tribunal." *Id.* And noted that as lawyers "whose profession and calling demands accuracy, clarity, and the pursuit of justice through the law, we must always present information honestly to the court." *Id.* at 2. The memo cautioned about the dangers of relying on AI to draft documents, and instructed staff to "[a]lways personally verify each quote or proposition with your eyes in an actual case or law or other valid source." *Id.* It also required every attorney in the United States Attorney's Office to complete two professional education courses on the rules of professional conduct by the end of March 2026. *Id.* at 2.

The United States Attorney concluded his opening remarks by noting that his office is taking this matter "very seriously," and intends "to ensure that it is not replicated ever again in this court by any of our lawyers." Hr'g Tr. at 7:24–8:3.

The Court then called Renfer to the stand. *Id.* at 8:4–5. The Court placed him under oath and ensured that he understood the consequences of giving false testimony. *Id.* at 8:7–12. At the outset, the Court gave Renfer the opportunity "to explain to the Court fully and candidly how those false quotations and representations came to appear in [his] filings." *Id.* at 8:17–19. Renfer responded by asking if he could read a statement, which the Court allowed him to do. *Id.* at 8:20–22.

6

Case 2:25-cv-00041-M-RN    Document 129    Filed 04/28/26    Page 6 of 18
Case 2:25-cv-00041-M-RN    Document 135    Filed 06/29/26    Page 7 of 19

In his statement, Renfer acknowledged that the filings described in the show cause order "contained citations that were not accurate and had not been verified before the document was submitted." *Id.* at 8:24–9:2. He took "full responsibility" for failing to ensure "that certain edits and verifications had already been completed" before the documents were filed. *Id.* at 9:2–5.

Renfer then said that he "would never, ever knowingly, deliberately, or intentionally submit any filing to any Court that [he] knew contained erroneous citations or quotations." *Id.* at 9:6–9. He explained that throughout his 30-year career, 17 of which were spent in the United States Attorney's Office, he understood the "duty of candor to the Court" as "fundamental." *Id.* at 9:16–19. He acknowledged that his "filing and explanation did not meet that standard." *Id.* at 9:21–22. Yet he maintained that he "did not knowingly make a false representation to the Court." *Id.* at 9:22–24.

Renfer then explained that after "reflecting on this matter" and his "responsibility for it," he had decided to separate from the United States Attorney's Office. *Id.* at 10:2–5. He took this step to acknowledge the seriousness of this matter and to reflect the consequences he believed were appropriate to address his actions. *Id.* at 10:5–8. He concluded by taking responsibility for his actions and apologizing to the Court. *Id.* at 10:12–13.

Notably, his statement made no mention of the use of generative AI in drafting any of the filings mentioned in the show cause order.

After Renfer's statement, the Court again gave Renfer the "opportunity to explain fully to the Court and candidly how those quotations and representations came to appear in [his] filing." *Id.* at 10:14–17. The Court then began to walk through the various fabrications and misstatements in his Response in Opposition to the Motion to Supplement the Administrative Record. *Id.* at 10:20–12:18.

7

Case 2:25-cv-00041-M-RN   Document 129   Filed 04/28/26   Page 7 of 18
Case 2:25-cv-00041-M-RN   Document 135   Filed 06/29/26   Page 8 of 19

In response, Renfer testified that he was working on several filings at the time he drafted the Response Brief. *Id.* at 12:19–24. He claimed that he inadvertently saved another filing over the draft of the Response Brief. *Id.* at 12:24–25. When he discovered on December 22, 2025, that he had saved over the response, he "panicked," and "used artificial intelligence to catch . . . back up[.]" *Id.* at 13:1–3. In what he described as an "error in the way I was editing," Renfer did not go back and verify the accuracy of the quotations in the Response. *Id.* at 13:4–14:8. He acknowledged that all of the issues identified in that document "suffer from the same problem." *Id.* at 15:12–14.

The Court also questioned Renfer about his statement in the Surreply that he inadvertently included the false quotations and citations. *Id.* at 21:11–18. He maintained that their inclusion was inadvertent because he "could have sworn" that he edited the Response. *Id.* at 21:19–23.

And to justify his claim in the Surreply that he had inadvertently filed an unfinalized draft document, he said that "what got filed was the unfinalized version, which [he] hadn't edited." *Id.* at 21:24–25.

When asked why the Surreply made no mention of his use of AI, Renfer did not directly address the question. *Id.* at 22:23–23:14. Instead, he claimed that he discussed this response with O'Hale, who found his response to be "appropriate." *Id.*

When Renfer's testimony concluded, the Court heard again from the United States Attorney. He noted that this was the first he had heard of Renfer using AI to draft the Response Brief. *Id.* at 32:24–33:6. When asked about Renfer's comments about the involvement of the Civil Chief in approving the Surreply, the United States Attorney said he was "unaware of the version of events that [Renfer]" shared with "the Court under oath[.]" *Id.* at 35:7–12. As far as he was aware, O'Hale's actions were "appropriate and proper." *Id.*

According to news reports, the Department of Justice fired Renfer the next day. Kyle Jahner, *AI Blunder in 'Big Boy Court' Prompts DOJ Firing of Attorney*, Bloomberg Law (Mar. 13, 2026), https://news.bloomberglaw.com/ip-law/doj-fires-lawyer-who-filed-ai-brief-after-poor-court-showing (https://perma.cc/Y6Y8-PRCS).

## II.   Discussion

The Court begins by assessing whether Renfer's conduct justifies imposing sanctions under its inherent authority. Sanctions are appropriate because Renfer abused the judicial process by submitting a brief containing fictitious authority. Next, the Court must determine the sanction necessary to remedy his misconduct. Considering the harm Renfer's conduct caused to the judicial process, his failure to be forthcoming with the Court about his use of generative AI, and that he engaged in this misconduct while holding a position of trust, significant sanctions are warranted. But since Renfer has already suffered substantial consequences because of his actions, the Court will limit its sanction to a public reprimand of Renfer.

### A.   Whether Renfer is Subject to Sanction Under the Court's Inherent Authority[1]

Article III of the Constitution vests federal courts with the "judicial Power of the United States[.]" U.S. Const. Art. III § 1. That power includes the inherent authority to sanction someone who "deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process[.]" *United States* v. *Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). While the Fourth Circuit has not established the evidentiary standard that must be met for a court to impose sanctions, district courts within the

---

[1] The Show Cause Order said the Court may sanction Renfer under either Rule 11 or its inherent authority. Rule 11(b)(3) requires attorneys to certify that a filing's "legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" Although Renfer's filings contained fabricated quotations and misstatements of case holdings, the legal contentions in his filings were valid. While some courts have invoked Rule 11 to address similar circumstances, the Court concludes that its inherent authority is better suited to address Renfer's conduct than Rule 11.

9

circuit regularly apply a clear and convincing evidence standard. *Yoder* v. *Conaway Racing & Trucking, LLC*, No. CVLKG-23–1365, 2026 WL 524140, at *8 (D. Md. Feb. 25, 2026). That standard is met when a court has "a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established[.]" *Jimenez* v. *DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001).

The record provides clear and convincing evidence that Renfer engaged in conduct that justifies imposing sanctions under the Court's inherent authority. There is no question that the Response Brief contained fabricated quotations and misstatements about case holdings. Renfer eventually admitted these items appeared in the document due to his use of generative AI to draft it. Hr'g Tr. at 12:19–13:3.

Courts across the country have found that similar conduct constitutes an abuse of the judicial process justifying sanctions. *See, e.g.*, *Whiting* v. *City of Athens*, 170 F.4th 455, 461 (6th Cir. 2026); *Fletcher* v. *Experian Info. Solutions, Inc.*, 168 F.4th 231, 240 (5th Cir. 2026); *Amarsingh* v. *Frontier Airlines, Inc.*, No. 24–1391, 2026 WL 352016, at *7 (10th Cir. Feb. 9, 2026); *In re Snowflake, Inc., Data Sec. Breach Litig.*, No. MDL 3126, 2026 WL 323102, at *2 (U.S. Jud. Pan. Mult. Lit. Feb. 5, 2026); *Jackson* v. *Auto-Owners Insurance Co.*, No. 7:24-CV-00136, 2025 WL 1932274, at *3 (M.D. Ga. July 14, 2025); *Nguyen* v. *Savage Enterprises*, No. 4:24-CV-00815, 2025 WL 679024, at *1 (E.D. Ark. Mar. 3, 2025); *United States* v. *Hayes*, 763 F. Supp. 3d 1054, 1064 (E.D. Cal. 2025); *Park* v. *Kim*, 91 F.4th 610, 615 (2d Cir. 2024). In fact, on the day the Court held the show cause hearing in this matter, the Fourth Circuit explained that "submitting a brief with nonexistent cases" qualifies as "'conduct that seriously interferes with the administration of justice' . . . whether through generative AI or not." *In re Nwaubani*, No. 25–9517, 2026 WL 687194, at *4 (4th Cir. 2026).

10

Renfer contends that his conduct was unintentional, because he meant to check the accuracy of the AI-generated content, but failed to do so. That contention does not stand up to scrutiny.

To begin with, Renfer's testimony belies his claim that his conduct was unintentional. Renfer eventually admitted that he intentionally used an AI tool to draft the Response Brief. Hr'g Tr. at 12:19–13:22. And he instructed his legal assistant to file that document. *Id.* at 22:19–22. Thus, he intentionally submitted a brief containing false materials to the court.

It is a basic principle of law that an actor is responsible for the natural and foreseeable consequences of his acts. *See* Restatement (Second) of Torts § 8A. It is, at this time, foreseeable that generative AI tools will provide fabricated legal authority when asked to engage in legal analysis. Renfer cannot avoid the consequences of his failure to account for that reality.

A rule that absolved an attorney of responsibility because he failed to verify the accuracy of AI-generated authority would place courts in an untenable position. An attorney who outsources core research and writing obligations to generative AI assumes the risk that its output will contain fictitious authority. That attorney cannot rely on his own lack of diligence to verify the authority in that document to shield himself from the consequences of his actions. A contrary rule would encourage attorneys to use generative AI tools in an irresponsible manner and leave courts without an effective means of policing this abuse of the judicial process.

Renfer's lack of candor reinforces the conclusion that he knowingly engaged in this misconduct. Renfer's Surreply did not mention his use of generative AI.[2] Nor did his opening

---

[2] Given Renfer's unwillingness to be forthright with the Court, it does not credit his explanation about the involvement of the Civil Chief in preparing the Surreply. Since Renfer passed up multiple opportunities to be fully transparent with the Court, there is no reason to believe he was candid with the Civil Chief about the circumstances that led to the fake quotes and misstatements appearing in the Response Brief. Even so, he would still be responsible for the Surreply's contents as he drafted it and filed it with the Court.

11

statement during the show cause hearing. It was not until the Court began directly questioning him about each fabrication and misstatement that Renfer admitted that he had used a generative AI tool to draft the Response Brief. Although he eventually acknowledged his conduct, Renfer's "post-hoc acknowledgment . . . [is] inadequate and demonstrate[s] that his conduct was knowing and deliberate." *Hayes*, 763 F. Supp. 3d at 1064.

Another aspect of Renfer's testimony raises questions about his candor to the Court. Renfer claims he "panicked" and used an AI tool to "catch . . . back up" on December 22, 2025, when he learned he had overwritten the draft response to Fivehouse's motion. Hr'g Tr. at 13:1–3. Fivehouse filed his motion on December 9, 2025. D.E. 82. Under the Court's Local Civil Rules, Renfer had until December 30, 2025, more than a week after he claims to have discovered the issue, to file his response. E.D.N.C. Local Civ. R. 7.1(f)(1) (allowing 21 days to file a response to a non-discovery motion). Given the time Renfer had left to respond, there was no need for panic, no need to use an AI tool to catch up, and no need to file the Response Brief without proper vetting on December 23, 2025. The Court finds Renfer's testimony about the circumstances that led to the Response Brief's filing not credible. This finding also supports the conclusion that his submission of a document that included fabricated materials was knowing and intentional.

The record establishes by clear and convincing evidence that Renfer knowingly and intentionally submitted a document to the Court that contained fabricated quotations and misstatements of case holdings. This conduct constitutes an abuse of the judicial process that is utterly inconsistent with the orderly administration of justice and undermines the integrity of the judicial process. Thus, the Court may sanction Renfer under its inherent authority.[3] The Court must next determine the appropriate sanction to remedy the harm caused by his conduct.

---

[3] Some cases suggest that a finding of bad faith is always necessary before a court imposes sanctions under its inherent authority. That is true when a court seeks to impose attorney's fees as a sanction. *See Chambers* v.

**B.     Sanction**

When exercising its inherent authority to sanction, a court must do so "with restraint and discretion." *Roadway Exp., Inc.* v. *Piper*, 447 U.S. 752, 764 (1980). And any sanction imposed should be designed to "remedy the harm caused by a party's abuse of the judicial process." *Beach Mart, Inc.* v. *L & L Wings, Inc.*, 302 F.R.D. 396, 406 (E.D.N.C. 2014) (citing *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)). In fashioning a sanction, a court should not only consider what harms have been suffered but must also keep an eye towards deterring future abuses. *Franklin Livestock, Inc.* v. *Boehringer Ingelheim Vetmedica, Inc.*, 251 F. Supp. 3d 962, 970 (E.D.N.C. 2017) (collecting cases).

Several factors support a significant sanction. The submission of fabricated authority imposes substantial costs on the opposing party, the court, and the judicial process. "Every paper filed with the Clerk of this Court, no matter how repetitious or frivolous, requires some portion of the institution's limited resources." *In re McDonald*, 498 U.S. 180, 184 (1989). When confronted with erroneous citations, the Court must review the filing, determine the correct course of action, and then take steps to redress counsel's misconduct. *United States* v. *Farris*, 170 F.4th 920, 923 (6th Cir. 2026). This work consumes time and resources, which should be allocated to serving "the interests of justice," not dealing with fabricated legal authority. *In re McDonald*, 498 U.S. at 184.

Further, "[t]he opposing party wastes time and money in exposing the deception," and misusing AI "promotes cynicism about the legal profession and the American judicial system." *Mata* v. *Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023). So by submitting false citations,

---

*NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). It is less clear whether a finding of bad faith is required to impose other sanctions. *See Chambers*, 501 U.S. at 58-59 (Scalia, J., dissenting) ("[T]he inherent sanctioning power must extend to situations involving less than bad faith. For example, a court has the power to dismiss when counsel fails to appear for trial, even if this is a consequence of negligence rather than bad faith."). To the extent such a finding is necessary, the Court also concludes that Renfer's misrepresentations and lack of candor meet the bad-faith standard. *See Harvey* v. *Cable News Network, Inc.*, 48 F.4th 257, 281 (4th Cir. 2022) (explaining that "fraud, deceit, misrepresentation, harassment, and unethical conduct" can support a finding of bad faith).

Renfer has burdened the Court, taken Fivehouse's time, and cast a shadow of invalidity on the judicial process. These are serious harms that require corrective action.

Another factor strongly favoring sanction is Renfer's lack of candor to the Court about his use of generative AI to draft the Response Brief. Courts have shown grace to attorneys who promptly admit their mistake. *See United States* v. *Simmons*, No. 4:25-CR-00009, 2026 WL 674372, at *1–2 (E.D.N.C. Mar. 10, 2026) (allowing an assistant federal public defender who, "of her own initiative," acknowledged the inclusion of AI-hallucinated cases in a sentencing memorandum to file a corrected document). Courts are less forgiving of attorneys who are unwilling or unable to do so. *See Fletcher* v. *Experian Info. Sols., Inc.*, 168 F.4th 231, 235–39 (5th Cir. 2026) (imposing a $2,500 sanction on an attorney who included AI hallucinations in a brief and noting that had she "accepted responsibility and been more forthcoming, it is likely that the court would have imposed lesser sanctions.").

Renfer's misdeeds are particularly odious because he undertook them while serving the Court and the people of the Eastern District of North Carolina as an Assistant United States Attorney, a position of immense trust and power. Attorneys serving in a United States Attorney's Office have "more control over life, liberty, and reputation than any other person in America." Robert H. Jackson, *The Federal Prosecutor*, 24 J. Am. Judicature Soc'y 18, 18 (1940). When "at his best[,]" an attorney serving in that prestigious role "is one of the most beneficent forces in our society[.]" But "when he acts from malice or other base motives, he is one of the worst." *Id.* Through his conduct, Renfer breached the trust placed in him by the Court and the people of the Eastern District. He disgraced not only himself, but also the entire office he formerly served. His conduct cannot be treated lightly.

Courts across the country have dealt with the scourge of AI hallucinations in a variety of ways. The sanctions imposed have included warnings, requiring attorneys to notify judges and clients, revocation of pro hac vice status, and monetary penalties, among other things. *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 497 (D. Wyo. 2025) (collecting cases).

While the Court is inclined to impose a significant sanction, it recognizes that Renfer has already paid a price for his conduct. The Court's show cause order and the show cause hearing received substantial attention from the legal press. Abigail Harrison, *Prosecutor Resigns, Judge Shows Slide Deck on AI Errors*, Law360 (Mar. 10, 2026) https://www.law360.com/articles/2450187/prosecutor-resigns-judge-shows-slide-deck-on-ai-errors (https://perma.cc/E7UQ-YB56) (reporting on the show cause hearing); Virginia Bridges, *Judge Weighs Next Steps After US Attorney Admits Using AI in Error-Ridden Brief*, News & Observer (Mar. 11, 2026) https://www.newsobserver.com/news/local/crime/article314992660.html (https://perma.cc/8TDX-VDXA) (reporting that Renfer was "facing sanctions for filing a legal brief with numerous errors admitted using artificial intelligence to help draft the document."); Amanda Robert, *Federal Prosecutor Resigns After AI Errors Found in Court Filing*, ABAJournal.com, https://www.abajournal.com/news/article/federal-prosecutor-resigns-after-ai-errors-found-in-court-filings (https://perma.cc/HK7E-QT6W) (reporting that Renfer "is resigning from his office after admitting that he made errors in a brief by using artificial intelligence."); Will Doran, *DOJ Attorney in Raleigh Accused of Fake Legal Arguments, Prompting Warning About AI from Prosecutor*, WRAL.com (Mar. 11, 2026) https://www.wral.com/news/nccapitol/raleigh-doj-lawyer-fake-citations-ai-boyle-legal-brief-march-2026/ (https://perma.cc/K8HR-G7SR) (noting that Renfer "is out of his job following allegations in court that he filed a legal brief with fake quotations and legal citations"); David Lat,

*You're Not the Boss of Me*, Original Jurisdiction (Mar. 8, 2026), https://davidlat.substack.com/p/judge-brian-murphy-kenneth-lee-doj-dc-circuit-executive-order-appeals (https://perma.cc/6PN5–8C38) (identifying Renfer by name and noting issuance of show cause order "for allegedly submitting a court filing with fake quotations and misstated case holdings"). He is also the subject of an investigation by the Department of Justice's Office of Professional Responsibility. Renfer's professional reputation, both locally and nationally, is in tatters. In this Court, his name will be synonymous with a failure to uphold the basic duties of competence and candor expected of every attorney.

The Court also recognizes that Renfer's conduct cost him his job in the United States Attorney's Office. His loss of employment imposes a financial burden well beyond the types of fines courts typically impose in connection with AI-related misdeeds. *See Wadsworth*, 348 F.R.D. at 499 (fining three attorneys between $1,000 and $3,000); *Gardner* v. *Combs*, No. 2:24-cv-07729, 2025 WL 3632704, at *4 (D.N.J. Dec. 15, 2025) (assessing a $6,000 fine); *Mata*, 678 F. Supp. 3d at 466 (imposing a $5,000 penalty). So the Court declines to impose a further financial penalty on Renfer for his conduct.

While the legal press and the Executive Branch have rendered their judgments on Renfer's conduct, the Court must too. Considering Renfer's abuse of the judicial process and his failure to be forthcoming about his use of generative AI, the Court will publicly reprimand him. This sanction is "more serious than an admonition" and is appropriate where someone "has caused harm or potential harm to . . . the administration of justice[.]" *See* 27 N.C.A.C. 1B.0103(38).

When combined with the other consequences Renfer has suffered, this sanction reflects the seriousness of his misconduct and underscores that the submission of fabricated authority will not be tolerated in this Court. It is sufficient, but not greater than necessary, to remedy the harm caused

by his abuse of the judicial process. Anything less would fail to vindicate the integrity of the judicial process and would risk signaling that such conduct can occur without meaningful consequence.

\* \* \*

This case is not an outlier. Courts across the country are increasingly encountering briefs that contain fabricated authority generated through the use of artificial intelligence. Research suggests that, as of a year ago, even AI tools designed by leading legal research providers can regularly provide fabricated authority. *See* Varun Magesh et al., *Hallucination-Free? Assessing the Reliability of Leading AI Legal Research Tools*, 22 J. Empirical Legal Stud. 216 (2025). The issue persists despite being widely publicized.

Due to the risk of fabricated authority, attorneys should exercise caution when using generative AI tools to conduct legal research or draft work product. Should they choose to do so, it is imperative that they verify the accuracy of the resulting work product before submitting it. And they should know that if they fail to do so, they will be held accountable. Attorneys should ask themselves whether the time and effort they will save by using generative AI to draft a legal document is worth the damage their career and professional reputation will suffer if they do not ensure the document's accuracy.

Courts, too, need to come to terms with the prevalence of this issue and the threat it poses to the administration of justice. In this case, the fabricated authority was detected by the opposing party and the Court, but what if it had not been detected? Courts rely on counsel to be truthful and submit accurate materials. *See Shaffer Equip.*, 11 F.3d at 457 (explaining that the adversarial system "depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions—all directed with unwavering effort to what, in good faith, is believed to

be true on matters material to the disposition.") Some judges may lack the time and resources to independently verify every citation, and not every client can afford to have their attorney conduct a deep-dive into each case cited by their opponent. A judicial decision based on fabricated authority can result in a miscarriage of justice, deny due process to the losing party, and undermine public faith in the courts. *See id.* ("Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent.").

Given these stakes, courts should begin meeting this challenge with an eye towards deterring similar conduct. This will, necessarily and unfortunately, involve moving beyond admonitions and reprimands into more punitive sanctions. Until attorneys reliably verify the accuracy of AI-generated materials, courts must take the steps necessary to safeguard the integrity of the judicial process.

## III.     Conclusion

By submitting a brief containing fabricated quotations and misstatements of case holdings and failing to be forthright about his actions, Renfer abused both the judicial process and the trust placed in him by the Court and the people of the Eastern District of North Carolina. The Court publicly reprimands him for his misconduct.

The Court also orders that the Clerk of Court submit this opinion for publication. And it orders the United States Attorney's Office to mail a copy of this Order to Renfer at his current or last known address.

Dated: April 27, 2026

Robert T. Numbers, II
United States Magistrate Judge

18